**HUNT–WESSON FOODS, INC., Plaintiff,**

v.

**CENTRAL TRUCK LINES, INC., Defendant.**

**No. CV475–95.**

United States District Court,
S. D. Georgia,
Savannah Division.

March 15, 1978.

Lamar C. Walter, Chamlee, Dubus & Sipple, Savannah, Ga., for plaintiff.

John F. M. Ranitz, Pierce, Ranitz, Berry, Mahoney & Forbes, Savannah, Ga., for defendant.

OPINION

LAWRENCE, District Judge.

*Findings of Fact and Conclusions of Law*

I

This is an action by Hunt-Wesson Foods, Inc., pursuant to 49 U.S.C. § 304(a), against Central Truck Lines, Inc., a motor carrier subject to regulation under the Interstate Commerce Act. Plaintiff sues to recover alleged overcharges by Central, totalling $12,172.35, in violation of Tariff 169–Q of

the Southern Motor Carriers Rate Conference (SMCRC).[1]

Hunt-Wesson claims that the overcharges resulted from being billed in accordance with the higher Class Rate established by the Tariff whereas the shipments should have been billed on the basis of the lower Point to Point Commodity Rate which was applicable thereto.[2]

The case was tried before this Court without a jury on February 16, 1978. Briefs have been filed.

The controversy over the proper freight rate involves the application and interpretation of the following provision of Tariff 517–F (page 5) Rules:

"(2) The loading . . . of the freight must be performed by the shipper at his expense, without any assistance from the carrier. The carrier employee and power unit is to be released while loading . . . is performed. At carriers' option the carriers' employee and power unit may remain during loading . . . but will render no assistance in loading. . . ."

II

*Background of Litigation*

During the period concerned (1972–'74), Hunt-Wesson maintained a food distribution center at Savannah. Shipments were made by motor carrier to consignees at various points in Florida. The customary procedure was for Hunt-Wesson to call the dispatcher of Central Truck Lines at its Savannah terminal and advise that trucks were needed for the purpose of loading and transporting shipments. A driver of the carrier would proceed with a tractor-trailer rig to the Distribution Center. The trailer would be backed up to a loading ramp preparatory to being loaded. The cartons were brought from the Distribution Center by hydraulic forklift trucks operated by employees of Hunt-Wesson. The cartons were stacked on wooden pallets supplied by the shipper.

During the loading process, Central's drivers were constantly present. Under the quoted provision of the SMCRC Tariff, the shipper had the duty to load shipments at its expense. The lower point-to-point rate contemplated that the carrier's driver and power unit (tractor) would be released during the loading so as to be available for services elsewhere. He had the option of remaining but was not to render any assistance in loading cargo. Hunt-Wesson presented testimony that the drivers stayed with the rig only for the purpose of checking the freight and seldom took part in the loading process. It is clear from the evidence that if a driver had disconnected the power unit and departed, the shipper would not have loaded the truck.

The carrier contends that the principal reason for the lower point-to-point commodity rate, as opposed to the straight class rate, was that in the former case the carrier's driver and power unit could be released for other work during the period of loading by the shipper. In the Savannah operation the carrier used three tractors and approximately twenty trailers. While they were being loaded, the driver and tractor could be employed elsewhere in delivering or picking up trailers. Hunt-Wesson witnesses testified that the loading took less than an hour in most cases. There was, however, evidence that normally only three trailers would be loaded during a working day.

The fact of the matter is that with few exceptions cargo could not be properly loaded by the shipper without the assistance of

---

1. Prior to the trial plaintiff reduced the amount of the claims to $8,531.62 by eliminating those in which it appeared that shipments exceeded 22 pallets. See Pl. Ex. 1.

2. The Tariff listed the Point to Point Rate and the Class Rate on Edible Goods between Savannah and various cities in Florida. The lower Point to Point Rates are designated by the symbol £ which is defined as meaning "Consignor to load the shipment." By way of illustration, the lower rate from Savannah to Miami was $1.04 per 100 pounds. The Class Rate for the same haul during the period in question varied from $1.35 to $1.42. It was used in billing shipper.

Central's driver. His services were indispensable. Union rules prohibited the forklift operators from "hand handling" any cargo once the forklifts entered the trailer. Central's driver checked and counted the cargo. Occasionally he would direct the placement of cartons for convenience in unloading at a particular destination. He physically handled the cartons in many instances. The floor of the trailer normally held 22 pallets. However, when 24 pallets were loaded the driver would have to move the top row of cartons on the rear pallets to keep them from falling off. Where more than 22 pallets were loaded the excess pallets would be dropped on the loading dock. The driver would hand load them into the trailer. If the load was uneven in height, the cartons had to be restacked in order to equalize the load. In the case of mixed shipments (that is, foodstuffs in different sized packages or cartons) drivers would stack the cases evenly in the trailer after breaking down the pallet.

In none of these phases of the loading process did the employees of the shipper participate. The Class Rate charged by the carrier to Hunt-Wesson was based on the theory that there was no complete loading by shipper and that the driver was required to assist therein and to remain with the rig during the loading. The term "loading" would seem to embrace, at least in part, the services performed by the driver. The Interstate Commerce Commission has defined the "process of loading and unloading" as "the movement of lading past the tailgate of motor vehicle which includes the storing, stacking, and breaking out of the lading within a motor vehicle." "We further believe," the Commission added, "that our

definition is consistent with industry usage and practice." See 343 I.C.C. Reports 457, 466; "Definition of Loading & Unloading by Various Carriers," No. 35445, 5/21/73.[3]

The bills of lading issued by Central to Hunt-Wesson bore in most cases the typewritten notation "Shippers Load." Plaintiff attaches importance to the omission of the words "and Count," citing the use of the term "Shipper's weight, load, and count" in 49 U.S.C. § 100. The effect of such language in bills of lading is to place the burden on the shipper to prove that the goods were properly loaded and counted. The term in that context is used for protection of the carrier from liability in case of damage or shortage to the shipment. See *United States v. Central of Georgia Railway Company,* 411 F.Supp. 1023, 1027 (E.D., Tenn.); *Dublin Company v. Ryder Truck Lines, Inc.,* 417 F.2d 777 (5th Cir.).

Counsel for Hunt-Wesson emphasize the fact that effective on November 30, 1974 (after the period of the shipments involved in this litigation) the Tariff was supplemented by the substitution of the words "Consignor to load and count the shipment" for "Consignor to load the shipment." See Tariff 169–R

This Court discerns no large significance in the amendment as far as this particular case is concerned. Whoever it was that had the burden of counting the cargo under the Tariff, the carrier assumed same. To load and to count cargo would seem to be different procedures although they occur simultaneously.[4] The fact that Central may have been under the duty to count does not mean that it was obligated to keep its driver with the rig in order to perform loading services for the shipper necessary to safe and proper

**3.** In the I.C.C. Opinion reference was made to a previous decision in which it was stated: "There is evidence which shows that stowing and counting involving use of a helper [carrier employee] is a customary part of the loading and unloading services of some of the respondents. However, it is not clear that use of a helper in performing those functions is an essential element of loading and unloading."

**4.** Central maintains that in the trucking industry "shipper's load" includes loading, weighing and *counting.* The Central and Southern Mo-

tor Freight Tariff which was in effect in 1973 provided that "the complete loading and/or unloading service . . . of the freight, including the count thereof, must be performed by the shipper and/or consignee at his expense." Complete loading service includes the loading of the freight into the carrier's vehicle and "the stowing and arranging thereof." The Rocky Mountain Motor Tariff, effective September 17, 1977, is identical to the Central and Southern Tariff.

stowage. It is apparently plaintiff's theory that the carrier's duty to count necessitated the driver to remain with the rig throughout the loading process. Therefore, irrespective of any hand handling by them, they would have to remain at the loading ramp.

Charles R. Miller who is Central's Vice President, Traffic, testified that he was the author of the 1974 amendment to the Tariff referred to above. He contends that it in no way altered the freight rates but was intended to clarify the misunderstanding between Hunt-Wesson and Central concerning the clause of the Tariff in controversy.

Additional comments are appropriate as to such dispute. Mr. Miller testified that in 1971 he negotiated the tariff rate with Mrs. Beryle Fritzie who is an official in the Traffic Division of Hunt-Wesson. He informed her that the straight class freight rate applied. She said she would look into the matter. The carrier's billings at the higher rate were paid by Hunt-Wesson. After the overcharge claims were filed, Mr. Miller discussed the matter with Mrs. Fritzie. She indicated to him that the claims would not be further progressed. However, she informed him that she did not have full authority. During the discussion, Miller stated that the carrier's claim in respect to the weight of shipper's pallets would be waived.[5] The additional freight charge had been overlooked by Central. No counterclaim has been filed. Mrs. Fritzie was not called as a witness by Hunt-Wesson.

### III

The difficulty in this case is not merely the wording of the Tariff and the failure to define "loading" and "load" more precisely. The trouble is that the provision dealing with that subject contemplates a situation unlikely in the realities of the trucking in-

dustry. If a shipper could completely and properly load a cargo without manual handling, we would have no problem with the clause. In that event, no loading help would be needed from the driver. But such a factual situation is an academic concept. Hand handling by drivers is necessary in many cases. Under the Tariff, the loading of freight "must be performed by the shipper at his expense, without any assistance from the carrier." But cargo cannot be stowed properly without some manual labor and shipper's Union contract forbade any such work by the forklift operators.

The language of the Tariff controls whether the straight class rate or the lower point-to-point rate is applicable under the facts. The bills of lading contained the statement that "All goods handled subject to tariffs of carrier as filed with the Interstate Commerce Commission." The shipper was required to load the freight but Hunt-Wesson employees did not perform every phase of that work. As a result, the driver and the power unit could not be released. The carrier had the option of remaining with the rig but without rendering assistance to the shipper in loading. This was an empty prerogative since, as stated, Hunt-Wesson would not load unless the driver was present to count the packages. More than that, it was necessary for him to remain in order to stack and arrange the cargo evenly.[6]

### IV

The most troublesome aspect of this case is whether the words "Consignor to load the shipment" includes the duty of counting. If the Tariff required the carrier to remain with the rig during the loading process in order to count the packages as the pallets were loaded by the shipper, it is not easy to justify the higher rate on the theory of the

---

5. "When shipments are loaded on pallets, the charges will be based on the applicable volume or truckload rate at the gross weight of the shipment, including the weight of the pallets." Pl. Ex. 4, SMCRC Tariff 169–R, p. 301.

6. A driver for Central (Joseph L. Byerly) testified that they were not permitted to leave at

any time during the loading and that if they had spotted the trailer at the loading ramp and had walked off, Hunt-Wesson would not load the truck. The shipper's warehouse supervisor confirmed that fact. He testified that the same was true if the driver had disconnected the power unit and left the distribution center.

opportunity for release of the driver and the tractor for other duties pending the loading.

However, there is a reverse side of the medal. If the obligation to count is that of the *shipper,* it would make no difference since the driver, in all events, had to remain in order to perform the manual part of the loading process which Hunt-Wesson declined to do.

The trucking of palletized cargo into the trailer and depositing it on the floor constitutes loading but not necessarily complete loading. The latter exists only after the cargo is evenly and properly arranged and stowed. Normally that requires the physical handling of cartons and packages. The fact that shipper's contract with the Union forbid hand labor within the trailer by its lifttruck operators did not transfer that responsibility to the carrier free of effect on the tariff rate. Central was not required to provide the loading services it furnished when the Tariff called for the shipper to perform same at its own expense.

Viewing the evidence as a whole, this Court concludes that under all the facts and circumstances the Class Rate and not the lower Point to Point rate was applicable to the situation. Such a resolution of the case is an equitable one and is in keeping with the meaning and spirit of the loading clause of the Tariff.

Since the findings and conclusions in this Opinion represent a sufficient compliance with Rule 50(b), they will not be formalized.

## ORDER

Judgment will be entered in favor of Central Truck Lines, Inc.